UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



PETER DENIGRIS, on behalf of himself and
all others similarly situated,

               Plaintiff,

        v.

BANK OF NOVA SCOTIA, BARCLAYS
BANK PLC, DEUTSCHE BANK AG, HSBC
HOLDINGS PLC, and SOCIÉTÉ
GÉNÉRALE,

               Defendants.

Civil Action No.

14 CV 1638

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

1.      This is a federal class action brought on behalf of all persons and entities (other than Defendants or their subsidiaries or affiliates) who, between January 1, 2004 and the present, held or transacted in physical gold or gold derivatives that settled or were marked-to-market at the London Fix,[1] or held or transacted in COMEX gold futures or options contracts. The allegations herein are based on: (a) personal knowledge of those matters relating to each Plaintiff, (b) publicly available pleadings, government investigatory documents, and other publicly available information concerning the conduct at issue in this action, and (c) information and belief.

2.      Plaintiff Peter DeNigris ("Plaintiff") alleges that, in violation of Section 1 of the Sherman Antitrust Act (the "Sherman Act"), Defendants Bank of Nova Scotia, Barclays Bank PLC, Deutsche Bank AG, HSBC Holdings PLC, and Société Générale combined, conspired, or agreed with one another to restrain trade through collusively manipulating prices of gold and gold derivatives contracts. Defendants engaged in this conspiracy for the purposes of profiting from this manipulation, both individually and collectively.

---

[1] The term "London Fix" is defined in paragraphs 36-43, *infra*.



3.      As explained below, these practices caused substantial harm to persons holding or transacting in physical gold and gold derivatives contracts by causing price declines in physical gold and gold derivatives, including COMEX gold futures and options.

4.      Because Defendants' intentional conduct was carried out with the intent to artificially fix prices of gold and gold derivatives, this conduct is *per se* unlawful.

5.      This collusive manipulation by Defendants has caused substantial harm to Plaintiff and members of the putative class.

## I.      PARTIES

### A.  Plaintiff

6.      Plaintiff  Peter DeNigris is a resident of New York State. During the Class Period, Plaintiff purchased and sold COMEX gold futures and options.   .  Because of Defendants' manipulation, Plaintiff transacted at artificial prices or in an artificial market.

### B.  Defendants

7.      Defendant Bank of Nova Scotia ("BNS"), doing business as Scotiabank ("Scotiabank") is a Canadian public company with headquarters in Toronto, Ontario, Canada. Defendant Scotiabank is licensed by the New York Department of Financial Services with a registered address at One Liberty Plaza, 22nd-26th Floors, New York, NY 10006. Defendant, through its broker-dealer affiliate The Bank of Nova Scotia, actively traded COMEX gold futures contracts during the Class Period.

8.      Defendant Barclays Bank plc ("Barclays") is a British public limited company with headquarters at 1 Churchill Place, London E14 5HP, England. Barclays is licensed by the New York Department of Financial Services with a registered address at 745 Seventh Avenue, New York, NY 10019, and a foreign representative office at One MetLife Plaza, 27-01 Queens Plaza North, Long Island City, New York 11101. Defendant, through its broker-dealer affiliate, Barclays Capital Inc., actively traded COMEX gold futures contracts during the Class Period.

9.      Defendant Deutsche Bank AG ("DB") is a German financial services company headquartered in Frankfurt, Germany. DB is licensed by the New York Department of Financial

Services with a registered address at 60 Wall Street, New York, NY 10005. Defendant, through its broker-dealer affiliate, Deutsche Bank Securities Inc., actively traded COMEX gold futures contracts during the Class Period.

10.      Defendant HSBC Holdings plc ("HSBC") is a British public limited company headquartered in London at 8 Canada Square, London E14 5HQ, England. HSBC has numerous subsidiaries in the United States, including HSBC Bank U.S.A., N.A., the principal subsidiary of HSBC U.S.A. Inc., an indirect, wholly-owned subsidiary of HSBC North America Holdings Inc. HSBC, through its broker-dealer affiliate, HSBC Securities (USA) Inc., actively traded COMEX gold futures contracts during the Class Period. Defendant HSBC, through its broker-dealer affiliate, HSBC Securities (USA) Inc., actively traded COMEX gold futures contracts during the Class Period.

11.      Defendant Société Générale ("SocGen") is a public banking and financial services company headquartered in Paris, France. Defendant SocGen is licensed by the New York Department of Financial Services with a registered address at 1221 Avenue of the Americas, New York, NY 10020. Defendant SocGen, through its broker-dealer affiliate, held by virtue of a joint venture with Credit Agricole CIB, NewEdge USA, LLC, actively traded COMEX gold futures contracts during the Class Period.

12.      During the Class Period, Defendants BNS, Barclays, DB, HSBC, and SocGen owned and were fixing members of the London Fix, were gold dealers, and bear responsibility for the alleged acts of their employees and the conduct and planning of the London Fix.

**II.      CO-CONSPIRATORS**

13.      In addition, various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of, the unlawful conduct alleged herein.

14.     Each of these unknown parties acted as the agent or joint venture of or for the named Defendants with respect to the acts, violations, and common course of conduct alleged herein.

15.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

### III.    JURISDICTION AND VENUE

16.     Plaintiff brings this action under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, to recover actual damages suffered as a result from Defendants' violations of the Commodity Exchange Act and CFTC Rule 180.1(a).

17.     Plaintiff brings this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the other Class members have suffered from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. §§1).

18.     This Court has subject matter jurisdiction over this action pursuant Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court also has jurisdiction pursuant to 28 U.S.C. §1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, et seq., which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds five million dollars and where the citizenship of any member of the class of is different from that of any Defendant. The five million dollar amount-in-controversy and diverse-citizenship requirements of CAFA are satisfied in this case.

19.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or

4

omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District. This Court has personal jurisdiction over each Defendant, because each Defendant transacted business throughout the United States, including in this District; and dealt with Class members throughout the United States, including Class members residing or located in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States. In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

20.     Venue is proper in this District pursuant to Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, because one or more Defendants resides or is found in the District. Defendants' unlawful acts allegedly manipulated the prices of COMEX gold futures contracts that were traded on COMEX, a designated contract market located in this district at One North End Avenue, New York, New York.

### IV.     INTERSTATE COMMERCE

21.     The activities of Defendants and their Co-Conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

22.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or the mails in connection with the unlawful acts detailed in this Complaint.

23.     Defendants each engage in substantial business activities in the United States that affect billions of dollars of commerce in gold and gold derivatives.

### V.     CLASS ACTION ALLEGATIONS

24.     Plaintiff, on behalf of himself and all Class members, seek damages against Defendants based on allegations contained of herein.

5

25.     Plaintiff brings this action on behalf of himself and, under Federal Rule of Civil Procedure 23(a) and (b)(3), as a representative of a Class defined as follows:

> All persons or entities in the United States and its territories that, from January 1, 2004 to the present, held or transacted in physical gold, or gold derivatives that settled or were marked-to-market based on the London Fix, or held or transacted in COMEX gold futures or options contracts. Excluded from the Class are Defendants, their co-conspirators, and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.

26.     *Numerosity.* Members of the Class are so numerous that joinder is impracticable. Plaintiff does not know the exact size of the Class, but believes that there are hundreds of Class members geographically dispersed throughout the United States.

27.     *Typicality.* Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants.

28.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving its own claims, Plaintiff will prove other Class members' claims as well.

29.     *Adequacy of Representation.* Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation. Plaintiff and its counsel have the necessary financial resources to adequately and vigorously litigate this class action. Furthermore, Plaintiff can and will fairly and adequately represent the interests of the Class and has no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class. Plaintiff understands and appreciates its duties to the Class under Rule 23 of the Federal Rules of Civil Procedure, is determined to diligently discharge those duties, and is committed to vigorously protecting the rights of absent Class members.

30.     *Predominance.* Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants

have acted on grounds generally applicable to the entire Class, thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

31.     *Commonality*. There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.     whether Defendants and their co-conspirators conspired among themselves and/or with others to manipulate prices of gold and gold derivatives contracts;

b.     whether Defendants and their co-conspirators manipulated prices of gold derivatives contracts;

c.     the duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

d.     whether the alleged conspiracy violated Section 1 of the Sherman Act;

f.     whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

g.     the appropriate measure of damages sustained by Plaintiff and other members of the Class.

32.     *Superiority.* Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

33.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.     FACTUAL ALLEGATIONS

### A.     The London Fix and the Market for Gold

34.     Gold is a "commodity" as defined by the Commodity Exchange Act, 7 U.S.C. § 1(a)(4). Gold also serves as the commodity "underlying" derivatives contracts, including gold futures and gold options traded on COMEX, a designated contract market located in New York, NY under Section 22 of the Commodity Exchange Act,  U.S.C. §25.

35.     Gold is the most popular precious metal for investors worldwide.[2] The World Gold Council estimates that the investable gold market, as of 2010, was approximately $2.4 trillion.[3]

36.     The price for gold worldwide is driven, in large part, by a process called the London Fix. The London Fix involves five representatives –Defendants BNS, Barclays, DB,[4] HSBC, and SocGen – on a teleconference.[5]

37.     These banks join a twice-daily teleconference commencing at 10:30 a.m. London time and 3:00 p.m. London time.[6]

---

[2] http://www.investopedia.com/features/industryhandbook/metals.asp

[3] http://www.exchangetradedgold.com/media/ETG/file/liquidity_in_the_global_gold_market.pdf

[4] DB has announced its withdrawal from the gold fixing process, but is remaining as a participating member until a buyer for its seat is found. *See* Maria Kolesnikova and Nicholas Larkin, *Deutsche Bank Withdraws From Gold Fixing in Commodities Cuts*, Bloomberg.com, Jan. 17, 2014, available at: http://www.bloomberg.com/news/2014-01-17/deutsche-bank-withdraws-from-gold-fixing-in-commodities-cutback.html

[5] Caminschi, A. and Heaney, R. (2013), Fixing a leaky fixing: Short-term market reactions to the London PM gold price fixing. J. Fut. Mark.. doi: 10.1002/fut.21636 at 4 (hereinafter, "Caminschi").

[6] *Id.*

38.     Although only the banks participate on the calls, they represent their market participant clients on the call. These participants include gold producers (miners, refiners), gold consumers (jewelers, manufacturers), investors, speculators, and sovereign states, among others.[7]

39.     At the beginning of the teleconference, one bank, designated as the Chair, proposes a starting price for the day, usually closely tracking the existing spot price for gold.[8] Each of the remaining members declares whether they are a net buyer or net seller at the proposed price. If there are no buyers or sellers at a given price, the chair will move the price until there are both buyers and sellers. [9]

40.     At that point, the auction moves to a secondary phase, where buyers and sellers identify the quantity of gold they would be buying or selling at the specified price.[10] These quantities are specified in increments of five bars.[11] The Chair will increase the price if the net purchases of gold would be more than 50 bars greater than the net sales at the price, and reduce it if the net sales would be more than 50 bars greater than the net purchases.[12]

41.     This process continues on for an indefinite period of time, usually in the range of 5-15 minutes, until the quantities are balanced to within 50 bars,[13] each "bar" being specified as between 350 and 430 troy ounces of gold with a minimum fineness of 995.0 parts per thousand fine gold.[14]

---

[7] Caminschi at 4.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] https://www.goldfixing.com/how-is-the-price-fixed/

[12] Caminschi at 4.

[13] *Id.*

[14] http://www.lbma.org.uk/pages/index.cfm?page_id=27

42.     Once the difference is 50 bars or less then the Chair may declare the price fixed and the banks will split the difference *pro rata* among themselves.[15] This *pro rata* arrangement is purely between the banks and will not affect their underlying customer orders.[16]

43.     London Fix members are not prohibited from trading in other gold-related instruments during the London Fix teleconference.[17] This permits the members critical foreknowledge, permitting them or their affiliates to trade derivatives with advance knowledge that the price is virtually certain to move in accordance with the fixing. Similarly, like in the instance of LIBOR-rigging, Defendants could be guided in their fixing statements with the knowledge of how their own derivatives positions would benefit or suffer from the fixing reaching certain thresholds.

**B.     Gold Derivatives – COMEX Futures and Options.**

44.     Derivatives are financial instruments whose underlying net worth is tied to the performance or value of another asset. Derivative contracts include, among other things, contracts for sale of a commodity for future delivery (typically referred to as "futures contracts") and options on such contracts. Both futures contracts and options are regulated by the Commodity Futures Trading Commission (CFTC).[18]

45.     Futures contracts are required to be traded on exchanges. These exchanges are known as designated contract markets.[19]

46.     COMEX (Commodity Exchange, Inc.) is a designated contract market located in New York, New York. COMEX has been owned and operated by the CME Group since 2008.[20]

---

[15] https://www.goldfixing.com/how-is-the-price-fixed/

[16] *Id*.

[17] Caminschi at 4.

[18] *See* 7 U.S.C. 2(a)(1)(A).

[19] *See* 7 U.S.C. § 7.

[20] *See* http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID=329722

COMEX offers a platform for trading of gold futures and options contracts, as well as contracts in silver and copper.[21]

47.     Among these gold contracts, COMEX offers standardized gold futures contracts with delivery dates commencing with the next calendar month and potentially extending as far as 72 sequential months into the future depending upon the month in which the contract was executed. The number of gold futures contracts trading at any given time varies. Trading is conducted for delivery during the current calendar month; the next two calendar months; each February, April, August, and October within a 23-month period; and any June and December falling within a 72 month period beginning with the current month. The two most immediate expirations are called "front months". "Front month" contracts are the most actively traded gold futures.

48.     A gold futures contract is an agreement to buy or sell gold in the amount specified as a term of the contract. The COMEX specifies the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.[22]  The contract size for gold futures is 100 troy ounces with minimum quality specifications of 995 "fineness."  The minimum price fluctuation for gold futures contracts is $0.10 per troy ounce.  Prices of gold futures are quoted in dollars and cents per troy ounce.

49.     Trades of COMEX gold futures contracts have two "sides." The "long" side represents the buyer of a contract who is obligated to pay for the gold and take delivery. The "short" side represents the seller of a contract who is obligated to receive payment for the gold and make delivery. If a market participant holds its position to the end of the settlement period for a gold futures contract, the market participant is obligated to "go to delivery." Once the

---

[21] http://www.cmegroup.com/product-codes-listing/comex-market.html

[22] *See, e.g.,*
http://www.cmegroup.com/trading/metals/precious/gold_contract_specifications.html

settlement date is reached, the futures contract for a particular month becomes a bilateral contract to pay for and deliver physical gold meeting the contract specifications.

50.     The gold futures contracts for the current delivery month terminate trading on the third last business day of the delivery month.  On this day, physical delivery of the gold must occur, with those long futures receiving the gold at specified locations, and those on the short side delivering the gold to those locations.

51.     No trades in gold futures deliverable in the current delivery month are made after the third last business day of that month. Any contracts remaining open after the last trade date are either: (A) Settled by delivery which shall take place on any business day beginning on the first business day of the delivery month or any subsequent business day of the delivery month, but no later than the last business day of the delivery month. (B) Liquidated by means of a bona fide Exchange for Related Position pursuant to CME Rule 538. [23]

52.     If delivery occurs, the entity delivering the gold must provide the gold from a CME-approved producer bearing the one or more of the CME's approved brand marks, assayed by approved assayer, and delivered with a licensed depository within a 150-mile radius of the City of New York.

53.     Gold futures prices for active months not going to delivery settle on a daily basis (and at final settlement) based on exchange activity between 13:29:00 and 13:30:00 Eastern Time ("ET"). The active month is the nearest base contract month that is not the current delivery month. The base months for gold futures are February, April, June, August and December.  The CME determines pricing according to the following schedule.

> a. Tier 1: If a trade(s) occurs on Globex (the electronic platform) between 13:29:00 and 13:30:00 ET, then the contract month settles to the volume-weighted average price (VWAP), rounded to the nearest tradable tick.

---

[23] *See, e.g.,* http://www.cmegroup.com/rulebook/NYMEX/1a/113.pdf

    b.  Tier 2: In the absence of outright trades during the settlement window, the active month settles to the best bid or ask in the expiring contract at market close that is nearest to the last traded price.

    c.  Tier 3: If there is no bid or ask in the expiring contract at that time, then the settlement price is implied from the bid/ask in the active spread at the close of the market.[24]

54. Few COMEX futures contracts result in actual delivery of the underlying commodities. Traders generally use futures contracts as a hedging mechanism or to speculate on movements in the price of a commodity and trade out of them prior to their expiration. For example, a purchaser of a gold futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of gold by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

55. Gold options contracts are also traded on COMEX.[25]  There are two types of options – calls and puts. A call option gives the holder of the gold option the opportunity to purchase the underlying futures contract at a certain price, known as the strike price, until the date that the option expires. Accordingly, if the price of the futures contracts trading on COMEX exceeds the strike price, a call will typically be exercised as "in the money". A put option guarantees the holder the opportunity to sell an underlying futures contract at the strike price until the date that the option expires. A put option is purchased when the party expects prices in the underlying contract to fall (analogous to a short position on a futures contract); a call option is purchased when the purchaser expects prices in the underlying contract to rise (analogous to a long position on a futures contract).

---

[24]  *See* http://www.cmegroup.com/trading/metals/files/daily-settlement-procedure-gold-futures.pdf

[25]  *See* http://www.cmegroup.com/trading/metals/precious/gold_contractSpecs_options.html

**C.     The Relationship Between the London Fix and the Price of Gold Derivatives.**

56.     Futures trading allows a trader to hedge against changes in prices of underlying

commodities in the future or speculate on future prices with the intention of making a profit.

57.     Futures contracts rarely result in physical delivery. As the United States Court of

Appeals for the Eight Circuit noted in *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1172-73 (8th Cir.

1971):

> While the obligation to make or take delivery is a bona fide feature
> of the futures contract, in reality the futures market is not an
> alternative spot market for the commodity itself, and indeed the
> functions performed by the futures market would probably be
> severely hampered if it were turned into an alternative spot market.
> Most parties who engage in futures transactions are in no position
> to either make or take delivery, and if they were required to always
> make preparations to fulfill their obligations to make or take
> delivery, the number of persons who could effectively participate
> in the futures market would be substantially restricted, thus
> reducing the liquidity and volume of that market. The main
> economic functions performed by the futures market are the
> stabilization of commodity prices, the provision of reliable pricing
> information, and the insurance against loss from price fluctuation.
> The functions can be fulfilled only if both longs and shorts can be
> assured that they can offset their contracts at non-manipulated
> prices.

58.     Nonetheless, the prices of the spot markets are intimately related to the prices on

the futures markets. This is because the futures price and the spot markets "converge" at the time

of delivery.  The convergence is the result of the futures contract converting at the point of

delivery to physical gold at a licensed depository near the City of New York.  Thus, for those

expecting delivery of gold futures (*i.e.*, the long contracts of the nearby delivery month), the

price at which they can sell the gold that they receive in delivery will be the spot (physical) price

of gold.

59.     The futures price is thus the market's consensus of the expected spot price for the

underlying physical commodity at a specified future date. Because the futures price is nothing

more than an expectation of the future spot price, both futures and physical prices must be and

are, in fact, correlated. For example, if the futures price in a contract negotiated today for delivery next month starts to rise, this indicates that the market believes spot prices will rise next month. The rise in the future price for next month delivery will cause a reaction today among producers and consumers of the commodity.

60.    This linkage has been documented. A study published in 2013 by Andrew Caminschi and Richard Heaney, entitled "Fixing a Leaky Fixing: Short-Term Market Reactions to the London PM Gold Fixing" researched the effects the 3 p.m. London Fix has on trades in COMEX gold futures contracts and concluded "it is evident that . . .  the GC [the trading symbol for COMEX gold futures] and GLD [a U.S. exchange-traded fund] . . . market [ is] significantly impacted by the London PM gold price fixing process. Both instruments exhibit large, statistically significant spikes in trade volume and price volatility immediately following the start of the fixing. Trade volumes increase over 50%, while price volatility increases over 40% following the fixing start."[26]

61.    The following chart demonstrates the marked strong influence that the London Fix has on COMEX gold futures prices. In fact, from January 2010 until December 2013, the London Fix and COMEX gold futures contract had a correlation coefficient of *99.99%*, with average price spreads of only 0.15% and average return spreads of 0.22%.



Gold Spot and Futures Prices: 2010-2013

**D.      Defendants' Unlawful Conduct**

62.      Plaintiff alleges that from approximately January 1, 2004 to the present, Defendants combined, conspired, and agreed with one another and unnamed co-conspirators to manipulate the prices of gold and gold derivatives contracts.

63.      This agreement was intended to permit each Defendant individually and all Defendants collectively to reap profits from their foreknowledge of price movements in the gold market.

64.      Anomalous price movements during the fixing window that are highly suggestive of manipulation can be witnessed on numerous days, where prices near the 3 p.m. London Fix reach a large spike and then retreat in the opposite direction as soon as the price is "fixed".

65.      For instance, on January 18, 2011, the COMEX futures price for gold immediately before the London Fix was approximately $1367. Halfway through the call, it reached a plateau at approximately $1369, before leaping to more than $1372. After the fix occurred, however, the price plummeted back to the pre-fix price. This movement around the fixing window is highly anomalous and suggestive of manipulation.



66.     Similarly, on August 26, 2011, the COMEX futures price sat at nearly $1784 at the beginning of the fix. Immediately after the call began, the price plummeted nearly $15 to $1770 before then leaping to $1795. Within 30 minutes after the 3 p.m. London Fix, the price had again dropped markedly. This movement around the fixing window is highly anomalous and suggestive of manipulation.



67.     On August 31, 2012, the COMEX Futures price was approximately $1660 before the 3 p.m. London Fix began. The London Fix was achieved quickly; the futures price demonstrates that the fix was achieved through massive sell orders by participants on the call, with the futures price settling at a price near $1652. Immediately after the fix, the futures price skyrocketed, suggesting that the sales during the 3 p.m. London Fix may have, in fact, been "spoof" trades – trades that are announced, but never intended to be carried out – with the purpose of suggesting a decline in the spot market price, permitting Defendants to enter large purchases after the fixing. This movement around the fixing window is highly anomalous and suggestive of manipulation.



68.     On May 22, 2013, after a period of relative calm, the futures price soared during the brief period of the London Fix call, moving more than $20 in a span of 13 minutes. After the call ended, however, the price fell more than $40 in the span of 45 minutes. This movement around the fixing window is highly anomalous and suggestive of manipulation.



69.     On October 3, 2013, the futures price leaped as soon as the call began, before tapering off somewhat before the price was fixed. Immediately after the call concluded, however, the price took a steep drop, again suggesting the possibility that the London Fix had occurred based on spoof trades. This movement around the fixing window is highly anomalous and suggestive of manipulation.



70.     These "spikes" show the influence of manipulative and collusive behavior. The pattern would not be explained by neutral or benign explanations, but demonstrate the manipulative conduct of Defendants to move prices on both the physical and derivative markets to their benefit.

71.     While these days are merely five examples, the volatility around the 3 p.m. London Fix is demonstrable over a period of years, as the following chart demonstrates. The chart demonstrates the rate of "return forecast error" – a square of the difference between predicted market moves based on econometrics and the market's actual moves. These return forecast errors hit a massive peak during the brief period that is encompassed by the 3 p.m. London Fix.



72.     This is contrary to what should occur in a market free of manipulation. The period surrounding 3 p.m. is the time at which the most futures contracts are traded, as the chart on the following page reflects. Accordingly, it should be the period during which the market is maximally efficient. Instead, it is the direct opposite. This, too, is highly anomalous and suggestive of market manipulation.

### Average On-The-Run Comex Futures Trading Volume: 2010-2013



**E.      Government Investigations and Studies**

73.     In recent months, numerous reports have confirmed investigations or studies related into the London Fix and the wrongdoing discussed herein.

74.     On March 13, 2013, The Wall Street Journal reported that the CFTC was "examining the setting of prices in London".[27]   The Wall Street Journal noted that the London Fix "helps determine the value of derivatives whose prices are tied" to gold – further noting that as of September 30, 2012, "U.S. commercial banks had $198 billion of precious metals-related contracts outstanding."[28]

---

[27] Katy Burne, Matt Day, and Tatyana Shumsky, *U.S. Probes Gold Pricing*, THE WALL STREET JOURNAL, March 13, 2013, *available at*:
http://online.wsj.com/news/articles/SB10001424127887324077704578358381575462340

[28] *Id.*

75.     In November 2013, it was reported that the Financial Conduct Authority, the United Kingdom's top financial regulator, had opened an investigation into the London Fix.[29] In an article detailing the reported investigation, Bloomberg quoted Thorsten Polleit, chief economist at Frankfurt-based precious-metals broker Degussa Goldhandel GmbH and a former economist at Defendant Barclays as saying, "Traders involved in this price-determining process have knowledge which, even for a short time, is superior to other people's knowledge. . . . That is the great flaw of the London gold-fixing."[30]

76.     The London Bullion Market Association indicated in November that it was reviewing its benchmarks to determine whether the benchmarks conform with IOSCO principles.[31] The IOSCO principles including making prices based on "observable" deals to increase transparency.[32]

77.     Rt. Hon. Pat McFadden, a Labour party lawmaker who sits on Parliament's Treasury Select Committee indicated that the FCA needed to investigate the gold market, stating "The gold market is hugely influential, and there needs to be public trust in the gold price." . . . Question marks have been raised about the benchmark price of gold, and it's important that regulators investigate."[33]

78.      In a February 4, 2014 hearing before the House of Commons Treasury Committee, McFadden questioned FCA CEO Martin Wheatley about the FCA's investigation into benchmarks other than LIBOR and the WM/Reuters rates, asking "We've had LIBOR.

---

[29]Liam Vaughan, Nicholas Larkin, and Suzi Ring, *London Gold Fix Calls Draw Scrutiny Amid Heavy Trading*, BLOOMBERG.COM, Nov. 26, 2013, *available at:* http://www.bloomberg.com/news/2013-11-26/gold-fix-drawing-scrutiny-amid-knowledge-tied-to-eruption.html

[30] *Id.*

[31] Nicholas Larkin, *London Bullion Market Association is Reviewing Benchmarks*, BLOOMBERG.COM, Nov. 22, 2013, *available at:* http://www.bloomberg.com/news/2013-11-22/london-bullion-market-association-is-reviewing-benchmarks.html

[32] *Id.*

[33] *Id.*

We've now got question marks over the foreign exchange markets. Are there any other benchmarks like this which are fixed here in London that you have concerns about or are investigating?"[34] Wheatley responded, "Yes, there are. Those investigations are not public, so I can't tell what the investigations are, but there are a number of other benchmarks – London being the center it is, there are a number of other benchmarks that operate in London that we are investigating because of concerns that have been raised with us."[35]

79.    Defendant DB has reportedly had employees interviewed by Bafin, Germany's top financial regulator, as a result of Bafin's investigation into potential manipulation of gold prices.[36]

80.    Elke Koenig, the president of Bafin, indicated that allegations about manipulation of foreign exchange and precious metals markets (including the gold market) were "particularly serious because such reference values are based – unlike LIBOR and EURIBOR – typically on transactions in liquid markets and not on estimates of the banks."[37] Bloomberg characterized his statement as indicating that the possible manipulation was "worse than the Libor-rigging scandal."[38]

81.    In fact, two Defendants here have been implicated and paid substantial fines as a result of investigations into LIBOR-rigging. Defendant Barclays settled with the CFTC, Department of Justice, and Financial Services Authority (the UK's precursor to the FCA) in June 2012.[39] Barclays avoided a fine from the European Commission by revealing the collusion to the

---

[34] Videorecording, House of Commons Treasury Committee meeting at 1:17:23-1:17:38, Feb. 4, 2014, *available at:* http://www.parliamentlive.tv/Main/Player.aspx?meetingId=14826

[35] *Id.* at 1:17:39-1:17:53.

[36] Karin Matussek and Oliver Suess, *Metals, Currency Rigging Is Worse than Libor, Bafin Says*, Bloomberg.com, Jan. 17, 2014,  *available at:* http://www.bloomberg.com/news/2014-01-16/metals-currency-rigging-worse-than-libor-bafin-s-koenig-says.html

[37] *Id*.

[38] *Id.*

[39] *See* Joshua Gallu, Silla Brush, and Lindsay Fortado, *Barclays Libor Fine Sends Stocks Lower As Probes Widen*, BLOOMBERG.COM, June 28, 2012, *available at:*

agency.[40] Defendant DB was fined €725 million by the European Commission, the most of any LIBOR defendant.[41]

82.     The same day that Bafin made its comments, it was reported that Defendant DB would withdraw from participating in setting gold and silver benchmarks.[42]

83.      On February 28, 2014, Bloomberg.com reported a study finding likely manipulation of the London Fix.[43] That study, by New York University professor Rosa Abrantes-Metz and Albert Metz, a managing director at Moody's Investors Service highlighted that the structure of the benchmark was "certainly conducive to collusion and manipulation" and noted that the empirical data were "consistent with price artificiality", concluding "[i]t is likely that cooperation between participants may be occurring."[44]

84.     When asked for comment on the study, officials at London Gold Market Fixing Ltd., the company owned by the banks that participate in the call, referred requests to SocGen. Officials at Barclays, DB, HSBC, and SocGen "declined to comment on the report and the future of the benchmark."[45] BNS did not respond to the request for comment.[46]

---

http://www.bloomberg.com/news/2012-06-28/barclays-451-million-libor-fine-paves-the-way-for-competitors.html

[40] Elena Logutenkova, *UBS, Barclays Dodge $4.3 billion EU Fines for Rate Rigging*, BLOOMBERG.COM, Dec. 4, 2013, *available at:* http://www.bloomberg.com/news/2013-12-04/ubs-barclays-dodge-4-3billion-eu-fines-for-rate-rigging.html

[41] Gaspard Sebag and Aoife White, *Deutsche Bank to RBS Fined by EU for Rate Rigging*, BLOOMBERG.COM, Dec. 4, 2013, *available at:* http://www.bloomberg.com/news/2013-12-04/deutsche-bank-to-rbs-fined-by-eu-for-rate-rigging.html

[42] Maria Kolesnikova and Nicholas Larkin, *Deutsche Bank Withdraws from Gold Fixing in Commodities Cuts*, BLOOMBERG.COM, Jan. 17, 2014, *available at:* http://www.bloomberg.com/news/2014-01-17/deutsche-bank-withdraws-from-gold-fixing-in-commodities-cutback.html

[43] Liam Vaughan, *Gold Fix Study Shows Signs of Decade of Bank Manipulation*, Bloomberg.com, Feb. 28, 2014, *available at:* http://www.bloomberg.com/news/2014-02-28/gold-fix-study-shows-signs-of-decade-of-bank-manipulation.html

[44] *Id.*

[45] *Id.*

### G.      Indicia of Agreement, Combination, or Conspiracy

85.      As discussed above, there are numerous indicia that Defendants' conduct was not merely coincidental but carefully crafted to disturb the efficient operation of markets for physical gold and gold derivatives.

86.      Defendants have each financially benefited from the anticompetitive conduct described above.

87.      Certain of the Defendants have been the subject of numerous investigations and proposed investigations, including by the Commodity Futures Trading Commission, Financial Conduct Authority, and Bafin.

88.      Defendants have engaged in parallel conduct that would not be consistent with market forces, declining to take advantage of gross inefficiencies by competitors in the market.

## VII.   ANTITRUST INJURY

89.      Defendants' restraints of trade and anticompetitive conduct adversely affected competition and prices in the market for physical gold and gold derivatives.

90.      Plaintiff and other Class members were deprived of the benefits of normal market operation, including market-determined pricing. As a consequence of Defendants' conduct, Plaintiff and the Class suffered substantial financial losses and were, therefore, injured in their business or property.

## VIII.   THE DISCOVERY RULE AND FRAUDULENT CONCEALMENT

91.      Plaintiff did not discover, and could not have reasonably discovered through the exercise of reasonable diligence, the wrongdoing discussed in this complaint, until, at the very earliest, January 2014, when Defendant DB withdrew from the fixing after interviews with Bafin, Germany's financial regulator.

---

[46] *Id.*

92.     Before the DB departure was announced and Bafin's president revealed the seriousness of the allegations, Plaintiff could not have stated facts plausibly stating the conspiracy to manipulate the price of gold and gold derivatives.

93.     The activity Defendants undertook was of a self-concealing nature. The London Fix teleconference is not publicly-accessible. The information Defendants received from their clients about the demand for purchases and sales of gold before and during the teleconference were not publicly-accessible. Without these pieces of information, Plaintiff would not be able to discern market dislocation or the existence of spoof trades.

## IX.     CAUSES OF ACTION

### COUNT I (PRICE-FIXING)

94.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

95.     Beginning at least as early as January 1, 2004, and continuing thereafter, Defendants and their coconspirators entered into and engaged in a contract, combination or conspiracy in restraint of trade to artificially manipulate prices of gold and gold derivatives in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Such contract, combination or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

96.     The contract, combination or conspiracy consisted of a continuing agreement, understanding or concerted action among Defendants and their co-conspirators in furtherance of which Defendants manipulated and determined the price of physical gold and gold derivatives.

97.     Defendants and their coconspirators' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected interstate commerce.

98.     As a direct and proximate result of Defendants' scheme, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined. Plaintiff's injuries consist of

transacting at artificial prices in an artificial and manipulated market. Plaintiff's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes defendants' conduct unlawful.

## COUNT II (PRICE MANIPULATION)

99.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

100.     Defendants and their coconspirators, through the acts alleged in this Complaint, specifically intended to and did cause unlawful and artificial prices of gold and gold derivatives, in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*

101.     Plaintiff and others who transacted in gold futures, including during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

102.     Plaintiff and the Class are each entitled to damages for the violations of the Commodity Exchange Act alleged herein.

103.     Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

104.     Plaintiff and other members of the Class who purchased or sold gold futures contracts, including COMEX gold futures contracts during the Class Period were injured and are each entitled to their actual damages for the violations of the Commodity Exchange Act alleged herein.

## COUNT III (MANIPULATION BY FALSE REPORTING, FRAUD, AND DECEIT)

105.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

106.     By their intentional and reckless misconduct, Defendants each violated Section 6(c)(1) of the Commodity Exchange Act, as amended, 7 U.S.C. § 9, and caused prices of gold

futures contracts, including COMEX gold, to be artificial during the Class Period. Defendants delivered and caused to be delivered for transmission through the mails and interstate commerce, by multiple means of communication, a false or misleading or inaccurate report concerning the London Fix or other market information or conditions that affect or tend to affect the price of gold and gold futures, which are commodities in interstate commerce, knowing, or acting in reckless disregard of the fact that such report was false, misleading or inaccurate.

107.    Under Section 6(c)(1) of the Commodity Exchange Act, as amended, codified at 7 U.S.C. § 9, and Section 22 of the Commodity Exchange Act, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC, which shall promulgate by not later than 1 year after July 21, 2010.

108.    In July 2011, the CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a) (2011), which provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud, make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading.

109.    Unlawful manipulation under the Commodity Exchange Act, as amended, and Rule 180.1 includes delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

28

110.     During the Class Period, Defendants used manipulative or deceptive devices or contrivances, in connection with contracts of sale of gold in interstate commerce, including, but not limited to, making untrue or misleading statements of material facts, or omitting material facts necessary to make the statements not misleading, including:

       a.     making untrue or misleading statements regarding the London Fix

       b.     failing to disclose, and omitting, that they engaged in spoofing

       c.     failing to disclose, and omitting, that they were unlawfully conspiring between and among themselves to manipulate COMEX gold prices;

       d.     issuing statements and directly engaging in the acts alleged herein knowingly or with reckless disregard for the truth; and

       e.     employing other deceptive devices as described above.

111.     Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

112.     Plaintiff and the Class are each entitled to damages for the violations of the Commodity Exchange Act alleged herein.

## COUNT IV (PRINCIPAL-AGENT LIABILITY)

113.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein

114.     Defendants BNS, Barclays, DB, HSBC, and SocGen and others were each an agent and/or other person on behalf of the other Defendants. Because they acted pursuant to and were members of a conspiracy and unlawful agreement, Defendants acted as one another's agents during the Class Period.

115.    This included when Defendants, through their employees, agents, and/or others directed, developed, executed, and otherwise acted with respect to the scheme alleged herein. Each Defendant is liable under Section 2(a)(1) of the Commodity Exchange Act, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts or omissions of its agents, employees, or other persons acting on their behalf.

116.    Plaintiff and Class members are each entitled to damages for the violations alleged herein.

## COUNT V (AIDING AND ABETTING LIABILITY)

117.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

118.    All Defendants are also liable for aiding and abetting manipulation.

119.    Each and every Defendant had extensive knowledge of the manipulation and, with such knowledge, materially assisted the manipulation by the other Defendants.

120.    Each Defendant made and benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the Commodity Exchange Act by the other Defendants.

121.    Each Defendant supervised the making of and benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the Commodity Exchange Act by the other Defendants.

122.    Each Defendant, by and through their respective partners, agents, employees and/or other persons, benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the Commodity Exchange Act by the other Defendants.

123.    Each Defendant participated in the development of the manipulative scheme and participated in the execution of, and supervised, the manipulative acts. Each Defendant also benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the Commodity Exchange Act by the other Defendants.

124.    Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations alleged herein. Defendants did so knowing of each other's manipulation of gold market prices, and willfully intended to assist these manipulations, which resulted in COMEX gold futures contracts reaching artificial levels during the Class Period in violation of Section 22(a)(1) of the Commodity Exchange Act, 7 U.S.C. § 25(a)(l).

125.    Plaintiff and the members of the Class are each entitled to actual damages for the violations of the Commodity Exchange Act alleged herein.

## COUNT VI (UNJUST ENRICHMENT)

126.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

127.    Because of the acts of Defendants and their coconspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Class.

128.    Plaintiff and members of the Class seek restoration of the monies of which they were unfairly and improperly deprived, as described herein.

## X.    DEMAND FOR JUDGMENT

129.    WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that the Court:

130.    Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided

by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

131.    Determine that the Defendants have violated Sections 1 of the Sherman Act and award Plaintiff and the Class treble damages, as well as costs and attorneys' fees, as well as injunctive relief;

132.    Determine that Defendants have violated the Commodity Exchange Act and award Plaintiff and the Class damages;

133.    Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution and disgorgement to Plaintiff and members of the Class;

134.    Award Plaintiff and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity; and

135.    Order such other, further and general relief as is just and proper.

**XI.    JURY DEMAND**

136.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.

Respectfully submitted this 10th day of March, 2014

Dated: March 10, 2014

Respectfully Submitted,

David E. Kovel
Daniel Hume
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile:  (212) 751-2540
dkovel@kmllp.com
dhume@kmllp.com

*Attorneys for Plaintiff Peter DeNigris*